UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEBRA J. WEIR,

      Plaintiff,

v.

SEABURY & SMITH, INC., d/b/a
MARSH U.S. CONSUMER,

      Defendant.

Case No. 13-cv-14329
Honorable Laurie J. Michelson
Magistrate Judge R. Steven Whalen

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [19]**

---

Call center manager Deborah Weir was terminated at the age of 56, after a long career notable for her efforts to ensure that her employer, Marsh U.S. Consumer ("Marsh"), complied with insurance laws. She believes her termination was unlawfully motivated by her age and her refusal to violate the law. Viewing the evidence in the light most favorable to Weir, as the party opposing summary judgment, the Court finds that no reasonable jury could conclude that she was terminated for failing or refusing to violate the Michigan Insurance Code, but a reasonable jury could conclude that she would not have been terminated but for her age. Summary judgment is therefore granted to Marsh on Weir's claim that she was terminated in violation of Michigan public policy and denied as to her age discrimination claims.

## I.  FACTUAL RECORD

*Background*

The unit of Seabury & Smith relevant to this case, Marsh U.S. Consumers, acts as a broker for insurance companies to sell policies and provide customer service to individual consumers. (Weir Dep. at 31–35.) Weir began working for Marsh in 1985, as a service claims

representative in Dearborn, Michigan. (*Id.* at 31–33.) She worked for Marsh in Dearborn continuously until her termination on August 31, 2012. (*Id.* at 37, 77.)

Marsh operated three call centers during the relevant time period: two in Iowa and one in Dearborn. (Seifert Dep. at 11–12; Weir Dep. at 37.) The three centers acted as one virtual call center, taking calls from anywhere in the country. (Weir Dep. at 92.) At the time of her termination, Weir was the head of the Dearborn call center. (*See id.* at 36; Resp. Ex. F at Pg ID 472.) Her title was "Call Center Manager II" ("CCMII"). (Weir Dep. at 36; Resp. Ex. C at Pg ID 432; Resp. Ex. F at Pg ID 472.) She was promoted to that position in 2005 by Matt Seifert, then a senior vice president at Marsh, after applying and interviewing. (Weir Dep. at 36; Seifert at 10.) Weir initially reported directly to Seifert. (*Id.* at 36, 96; Seifert Dep. at 10.) By 2011 Seifert had been promoted; although he continued to indirectly supervise Weir, her direct supervisor was Jose Iregui in 2011, Wendee Prom at the beginning of 2012, and Cheryl Paine beginning in May 2012. (Weir Dep. at 36, 96, 117, 136; Seifert Dep. at 10–11; Paine Dep. at 22–25.) Seifert, Iregui, Prom, and Paine were based in Urbandale, Iowa. (Resp. Ex. D at Pg ID 447; Resp. Ex. F at Pg ID 536.)

The two call centers in Iowa were managed by Tracy Gonzalez, who reported to the same supervisors as Weir. (Gonzalez Dep. at 10–11; Resp. Ex. F at Pg ID 472.) Gonzalez was a "Call Center Manager I" ("CCMI") when she first started managing the Urbandale call center in 2008. (Gonzalez Dep. at 10.) In 2011 she became a CCMII (like Weir) and helped to open the new call center in Newton. (*Id.* at 10; Resp. Ex. D at Pg ID 447.) In 2012, Gonzalez's staff at the Newton, Iowa center consisted of a CCMI, three supervisors, and 48 agents. (Resp. Ex. F at Pg ID 472.) At the Urbandale, Iowa center, Gonzalez had five supervisors and 55 agents, but no CCMI. (*Id.*)

Weir's staff at the Dearborn center in 2012 consisted of a CCMI, two supervisors, and 37 agents. (*Id.*)

It is not disputed that Weir was a competent and hardworking employee. (Compl. ¶ 15; Ans ¶ 15.) In 2006, Seifert nominated her to become a vice president, noting: "Since taking on the rol[e] of office lead in 2005, Deb has done an outstanding job. She had kept her team highly motivated. In fact, her sales teams' close rate was the best among all call centers in 2005." (Resp. Ex. W at Pg ID 561.)

Weir's 2011 performance review was very positive. (*See* Resp. Ex. C at Pg ID 432–44.) Iregui gave her an overall rating of 4 out of 5 (*id.* at Pg ID 433)—effectively the highest possible rating because "to get a 5, you have to walk on water." (Paine Dep. at 105; Weir Dep. at 117.) Iregui wrote that Weir "manages a strong team that understands the vision of the company and that strives to do better every day," and she "is constantly analyzing data looking for better and more efficient ways to leverage off resources and increase the bottom line, without ever compromising the integrity and the values of the company." (Resp. Ex. C at Pg ID 440.) Prom wrote that Weir "is driven by performance and excellence and at times that drive, prevents her from understanding the big picture and other people's points of view." (*Id.* at Pg ID 442.) Prom continued: "She needs to continue bringing up issues of concern until they are addressed and fixed in an appropriate manner." (*Id.*) Prom also noted that Weir "was chosen to do the 'Greater Good' training as a testament to her commitment to integrity and values as well as her ability to convey this message." (*Id.*) In her response to the review, Weir wrote:

> We discussed the tension between the other personal lines leaders and how to resolve as this seems to be an ongoing challenge. I feel I am able to develop very strong working relationships with our external carrier partners and other internal depts within the Company. The only relationship that carries the tension is within the Personal Lines leadership team. My recommendation to Matt [Seifert] and

Wendee [Prom] is to have a clear vision/directive from senior mgt so we're all clear on the direction and then hold the leaders accountable. They agreed.

(*Id.* at Pg ID 444.)

*Call Center Compliance Issues*

To sell home and automobile insurance to a consumer, the agents who handled the calls had to be licensed in the state where the consumer lived. (Weir Dep. at 90.) The call center system was designed to route calls to an agent licensed in the state from which a consumer was calling. (*Id.* at 93–94.) New employees needed time to build up their licensing, but tenured employees were generally licensed in every state. (*Id.* at 94.) Agents also had to be appointed by the insurance company in order to sell policies for that company. (*Id.* at 89.) Appointments were also done state by state. (*See* Resp. Ex. P at Pg ID 534.) A key duty for the managers of the call center was to ensure that the agents were properly licensed and appointed. (*Id.* at 96–97.) Marsh also had a compliance department that assisted with licensing requirements. (*Id.* at 100; Seifert Dep. at 34, 42; Bushore Dep. at 10.)

Weir testified that the Iowa call centers consistently had a problem with agents selling policies for which they were not properly licensed or appointed. (Weir Dep. at 95–97.) She said it was an ongoing problem that she first raised with Seifert around 2006, when an audit by Travelers Insurance Company found that policies were being sold by agents who were not properly licensed. (*Id.* at 96–97.) According to Weir, at some point between 2006 and 2010, Seifert told her "management knows about it, it's not a big deal." (*Id.* at 139–40.) Seifert testified that he took Weir's concerns seriously and "first thing I did was talk to our management team and say that the practice needed to stop." (Seifert Dep. at 39–40.) He also testified that on at least one occasion, he sent an email to the compliance department asking them to look into the issue. (*Id.* at 43–44.)

4

Weir said there was a big growth spurt sometime after that, with a lot of newly hired agents and a lot of new business. (Weir Dep. at 96–101.) To get the new hires on board quickly to handle the increased call volume, Weir said that Seifert suggested the new hires could share credentials or use credentials from terminated employees. (*Id.* at 101–04.) Weir said: "I told him that I would not support that. You know, that it went against the policy that the company has. It went against our contractual agreements with our carriers, and it went against the state licensing requirements. So I would not put my agents on the phones until they were properly licensed and appointed." (*Id.* at 102.) But she said she could see in the computerized tracking system that it was happening at the other call centers. (*Id.* at 102–05.) The issue was a regular agenda item for the call center managers' teleconferences with Seifert during this period. (*Id.* at 99, 105.) An audit process was developed to address the problems. (*Id.* at 105–08.) After that, Weir said, "it was not a standing item any longer, because we were under the impression we're good here; everybody agreed this is what we're going to do." (*Id.* at 105.) But when Weir began reporting to Iregui in 2010 or 2011, she was still seeing these issues; she raised them with him and he brought her concerns to Seifert. (*Id.* at 96, 136; Seifert Dep. at 39–41; *see* Resp. Ex. D at Pg ID 451.)

In September 2011, Marsh's compliance department received an anonymous complaint about Gonzalez via an internal hotline. (Resp. Ex. D at Pg ID 446; Harrison Dep. at 29–30, 44.) The caller said that agents supervised by Gonzalez "were not following compliance guidelines," and the issues were "elevated to Gonzalez and she did not follow up." (Resp. Ex. D at Pg ID 446.) Marsh compliance officer Terri Harrison investigated the complaint. (*Id.* at Pg ID 447; Harrison Dep. at 29–32.) Her January 2012 report concluded, "[w]hile this investigation identified evidence of instances where existing protocols and procedures were not properly followed," it "did not identify significant compliance issues nor was there evidence that the

procedural deficiencies were not addressed once discovered." (Resp. Ex. D at 453; Harrison Dep. at 121–22.)

When Harrison interviewed Seifert for the investigation, Seifert said he was not aware of any material concerns about Gonzalez's performance or ethics, or any failure by her to address compliance issues. (Resp. Ex. D at Pg ID 449.) He noted that "some time ago . . . Iregui had expressed concerns about Gonzalez," but he believed these concerns "came from misinformation from the Dearborn call center." (*Id.*) Specifically, he said that Iregui "expects [Gonzalez] to do the same kinds of things [Weir] does but he fails to understand how much bigger job [Gonzalez] has." (*Id.*) He indicated that this criticism came from Weir, who "expected all other managers to 'manage like [Weir] does' despite the significant differences in responsibilities." (*Id.*) There was "a lot of rivalry between the two offices," Seifert told Harrison, and "at one point it had become so contentious that [Gonzalez] thought about resigning her role and transfer[ring] out of the Call Center." (*Id.*) Seifert "speculated that the hotline complaint emanated from the Dearborn Call Center." (*Id.*)

Iregui also noted, when interviewed by Harrison for the investigation, "longstanding rivalry between Dearborn and the Urbandale operations," but said "he didn't think Seifert gave [Weir] proper acknowledgment of her contribution to the call center's success." (*Id.* at 450.) Iregui "believed her to be the strongest manager he ha[d] but acknowledged that he and Seifert did not agree on this point." (*Id.*)

Harrison also interviewed Jana Magnussen, the managing director of human resources at Marsh, about the allegations against Gonzalez. (*Id.* at Pg ID 447.) Magnussen said that Gonzalez was "considered a strong performer overall" but her current role "was clearly a stretch role for Gonzalez from a span of control perspective, particularly given Gonzalez's somewhat limited

managerial experience." (*Id.*) Magnussen "indicated that Seifert was a strong proponent of a number of his direct reports (e.g. Gonzalez and Wendee Prom) and at times this loyalty interfered with his objectivity regarding their respective developmental needs." (*Id.*)

In December 2011, Travelers Insurance Company conducted another audit of its policies sold by Marsh and found that of 80 policies that were audited, 14 were improperly sold by an agent who was not appointed by Travelers to sell in that state. (Resp. Ex. P at Pg ID 534; *see* Weir Dep. at 134.) And one of the 14 was sold by an agent who was not licensed to sell insurance in the state. (Resp. Ex. P at Pg ID 534.)

Then in February 2012, someone at Travelers sent an email to someone on Weir's staff that seemed to indicate that agents who were not yet appointed by Travelers could sell Travelers policies—contrary to Weir's understanding. (Resp. Ex. DD at Pg ID 586–88; *see* Weir Dep. at 134–38.) Concerned, Weir forwarded the email to Lynn Marion, Marsh's head of compliance, and also raised it with Prom, then Weir's direct supervisor. (Resp. Ex. DD at Pg ID 586; Weir Dep. at 135–36.) A conference call with Travelers, Marion, the licensing department, and the sales supervisors and call center managers followed and it was found to be a misunderstanding. (Weir Dep. at 136–38.) But in the meantime, Weir had told Marion that "we had this ongoing issue" (Weir Dep. at 136), apparently referring to licensing and appointment compliance. As a result, the call center's processes for ensuring that agents were properly licensed and appointed were revamped again. (Weir Dep. at 137; Resp. Ex. DD at Pg ID 590–92.)

In July 2012, during a routine compliance monitoring review of the call centers, Weir told Marsh compliance officer Anne Bushore that agents were improperly sharing login credentials to sell policies. (Bushore Dep. at 24–25, 43; Mot. Ex. 8 at Pg ID 237–38.) When Bushore asked Weir, in a follow-up email, for more details such as the names of the people

7

involved, Weir said, "[t]here were numerous [agents] involved," and "the practice went on over several years." (Mot. Ex. 8 at Pg ID 237.) When asked how many times it occurred, she said "Quite a few—it was [standard operating procedure] for some areas." (*Id.*) She noted that when the issues occurred, she reported them to the managers of the agents involved—Tracy Gonzalez and the Newton CCMI—and to her own manager, Iregui. (*Id.*) Bushore reported Weir's comments to the compliance department, and Harrison completed an investigation. (Mot. Ex. 14 at Pg ID 272.) The outcome of that investigation, if any, does not appear to be in the record before the Court. (*See* Bushore Dep. at 43–45; Mot. Ex. 14 at Pg ID 272.)

*Weir's Termination*

Seifert made the decision to terminate Weir in May 2012. (Seifert Dep. at 119–21.) He told Human Resources that he wanted to put her on the list of people to be targeted for "Q3 action," or termination through a reduction in force. (*Id.*; see Resp. Ex. H at Pg ID 488–89.) Seifert explained at his deposition that he had been asked to make expense reductions, "and Dearborn had a heavy management structure for the number of folks that they had." (Seifert Dep. at 120–23.)

Shortly thereafter, Cheryl Paine was hired to head up all three Marsh call centers. (*Id.* at 128; Paine Dep. at 22–25; Resp. Ex. I at Pg ID 491.) Paine testified that when she started, she talked to many "stakeholders and business partners," such as the marketing department, to get their impressions of the team she would be running and where it could improve. (Paine Dep. at 40–41.) She said that from these conversations, she learned of two problem areas: first, that "the business was pulling back, if you will, in terms of their marketing efforts to ensure that the volumes could be handled by the call center," and "[a]s a result we weren't fulfilling client expectations." (*Id.* at 42.) And second, that "the teams—the [Iowa and Dearborn] locations

didn't work effectively together. There was a perception of a 'we versus they' mentality"; in other words, "it was perceived that the locations didn't get along with each other." (*Id.* at 44.) Paine said she did not recall any criticism directed specifically at Weir or the Dearborn call center. (*Id.* at 45, 48–49.)

Seifert tasked Paine "with repairing and transforming" the call centers because they "had a number of issues overall." (Seifert Dep. at 128.) Paine explained that at the time she was hired, the Marsh call centers were "not in a good place. They were not meeting expectations." (Paine Dep. at 83.) So Seifert asked her "to solve that problem and improve the service levels and improve the business, improve the retention [of agents]." (*Id.* at 83–84.) And, Paine explained, in her "experience, part of that is identifying do you have the right leaders in place to drive the business forward and to participate in that solution." (*Id.*) Paine acknowledged that Dearborn had substantially better retention of agents than the other two locations: 25 percent attrition in Dearborn versus 40 percent in Newton and 74 percent in Urbandale. (*Id.* at 52, 80.) But she could not comment on whether specific quality metrics such as average call handling time and speed to answer were greater or less in specific locations; her "perception was that as a team the team wasn't performing acceptably across all locations." (*Id.* at 58–59.) She explained that "[t]he retention [of agents] information was available by location," but "[t]he service level, because of the way the business operates, isn't a metric that's routinely evaluated." (*Id.* at 82.) Nonetheless, Paine said she did not believe that attrition/retention of agents, average call handling time, speed to answer, quality, and customer satisfaction played a role in the decision to terminate Weir, and she did not recall "specific deficiencies related to Dearborn." (*Id.* at 63–64.)

In fact, Paine testified that her impression was that Weir "was very good at managing the office" and "she excelled at handling the day-to-day responsibilities." (*Id.* at 49.) Paine said she

did not observe any performance deficiencies "in terms of [Weir's] responsibilities of running the personal lines office in Dearborn." (*Id.* at 50.) But Paine saw Weir "as a manager, not a leader." (*Id.* at 85.) She explained that Weir "was not successful at what [Paine] would describe as more strategic opportunities or getting others to buy into her way of doing things or seeing, you know, different way of doing things," so "she was successful as a manager in terms of managing the day-to-day operations in Dearborn, but not successful in terms of leading the organization to solve problems identified here." (*Id.* at 85.) But Paine admitted that the first time she met Weir was the day she fired her, seven weeks after Paine started at Marsh. (*Id.* at 85–86.)

Paine said she did not know whether there were any discussions about terminating Weir before she made the recommendation to eliminate Weir's job as part of a reorganization plan for the call centers. (*Id.* at 89–91.) She did not recall discussing the elimination of Weir's position with Seifert before she prepared the reorganization plan. (*Id.* at 91.) When asked whose idea it was to eliminate Weir's position, Paine said: "Mine. In this—as part of this plan, elimination of the position in Dearborn or reclassification of the position in Dearborn to an overall center manager was part of my plan to address the issues within the personal lines team." (Weir Dep. at 92.) But when she submitted the reorganization plan to Seifert for approval, she noted that Weir was "currently on the Q3 action list." (Resp. Ex. F at Pg ID 468.)

Paine's reorganization plan, submitted to Seifert on July 19, 2012, called for one CCMII to head up all three call center locations and report directly to Paine. (Resp. Ex. F at Pg ID 468, 473.) There would be one CCMI to head up each location and report to the CCMII. (*Id.* at 473.) To accomplish this, Paine proposed to "[r]eclassify Dearborn Call Center Manager II position (Deb Weir) to a Call Center Manager I for the Urbandale location," which did not have a CCMI at the time. (*Id.* at 471.) (The Dearborn location already had a CCMI.) But Paine did not propose

transferring Weir to the CCMI position in Urbandale. Instead, her proposal contemplated severance costs for Weir and an "open" CCMI position in Urbandale. (*Id.* at Pg ID 473–74.) The other CCMII, Gonzalez, was to "take a demotion into a different role in the organization," according to Paine's proposal. (*Id.* at Pg ID 471.) Paine testified that it was not her decision to demote Gonzalez, and that the decision had been made before she submitted her proposal. (Paine Dep. at 88–89.) She said she did not know who made the decision. (*Id.*) With both existing CCMIIs eliminated, Paine proposed to hire Nick Carlson as a CCMII "with leadership expertise." (Resp. Ex. F at Pg ID 471.) Paine's proposal summarized the "Financial Impact" as follows:

- Headcount remains the same.
- Severance costs of $99,485 (Weir).
- Year over year flat compensation impact.
  - Current (Weir/Gonzalez) Salaries = $166,500
  - Proposed (Carlson/Open) Salaries = $100,000 + $60,000 (anticipated) = $160,000

(*Id.* at Pg ID 474.) Thus, the reorganization proposal was to eliminate two management positions, add two management positions, and save an anticipated $6,500 per year, if Weir's $99,485 severance pay is not considered. (*Id.*) And the only reduction in force was Weir's termination. (Paine Dep. at 36.) Seifert testified that a reduction in force "probably wouldn't be worth the bother for something like $60,000," which was "pretty insignificant." (Seifert Dep. at 124.) Nonetheless, Seifert passed the proposal on for approval. (Resp. Ex. F at Pg ID 467–68.) The plan was approved by "Legal" on July 24, and by Seifert's supervisor Liz Flynn on July 25. (*Id.* at Pg ID 467–68; *see* Seifert Dep. at 122.)

In a letter dated July 26, 2012, Gonzalez's "internal transfer" to "Operations Manager I" in another division of Marsh was confirmed. (Resp. Ex. K at Pg ID 497.) Gonzalez testified that she applied for the position. (Gonzalez Dep. at 12.) But according to an affidavit from Weir's

11

counsel, the only application in Gonzalez's personnel file was her original 2001 application for a customer service position. (Resp. Ex. M at Pg ID 503.) Janelle Soderholm from Marsh Human Resources testified that Gonzalez "made the personal decision to apply for another opportunity within the organization," but Soderholm did not know "how it came all about as [she] was not involved in that." (Soderholm Dep. at 28.) Gonzalez acknowledged that the transfer was a demotion, but her salary remained the same. (Gonzalez Dep. at 12, 15.) She said no one told her that her position as CCMII was in jeopardy at the time, although she had received negative feedback about her performance from Iregui and Paine. (*Id.* at 12–15.) She said she did not receive any feedback, either negative or positive, from Seifert. (*Id.*) Seifert testified at his deposition that although Gonzalez "did fine at some of her jobs," in the CCMII position "she wasn't quite as good" and was "possibly over her head." (Seifert Dep. at 32–33.)

When Paine submitted her reorganization plan to Seifert on July 19, 2012, Paine and Prom had already interviewed Nick Carlson for the CCMII position. (*See* Paine Dep. at 108.) Carlson had submitted an application for a CCMII position on or about July 5, 2012, and was interviewed on or about July 11, 2012. (Compl. ¶ 52; Ans. ¶ 52; Resp. Ex. Z at Pg ID 567–69.) It is also not disputed that Carlson had never worked in the insurance industry in any capacity. (Compl. ¶ 51; Ans. ¶ 52; *see* Resp. Ex. U at Pg ID 548–53.) He did have significant experience managing multiple, large call centers. (Resp. Ex. U at Pg ID 548–53.) The letter confirming an offer of employment to Nick Carlson to be the CCMII in charge of all three Marsh call center locations is dated August 1, 2012. (Resp. Ex. N at Pg ID 505.) He was 33 years old at the time. (Compl. ¶¶ 51–52; Ans. ¶¶ 51–52.)

On August 6, 2012, Weir was told that her position was being eliminated due to an organizational restructure, and that her employment would terminate as of August 31, 2012.

12

(Weir Dep. at 77–78; Compl. ¶ 44; Ans. ¶ 44.) At the time of her termination, Weir was 56 years old. (Compl. ¶¶ 13, 45; Ans. ¶¶ 13, 45.)

Weir said she did not learn about the CCMII opening for which Carlson applied until she was terminated. (Weir Dep. at 133.) It is not clear whether Weir was given the option to apply for other jobs at Marsh when her position was eliminated. At her deposition there was this exchange:

> Q. Okay. Do you know who made the decision relative to the selection of Mr. Carlson for that position?
>
> A. No, I didn't even know there was a position until I was terminated.
>
> Q. Did you look at the listing of open positions within the company?
>
> A. Yes.
>
> Q. And how often would you look at that list?
>
> A. They would send—I want to say it was every Friday there was like a little news thing that HR would send out with the listings in it, and I would go and look.
>
> Q. Did you apply for any position?
>
> A. There was no position posted.
>
> Q. Have you ever applied for any position within the defendant?
>
> A. Other than where I'm at now or where I was, no.

(*Id.* at 133.) When Soderholm was asked at her deposition whether Weir was given the opportunity to apply for the position Gonzalez took, she said, "Any of our colleagues can apply for opportunities. As long as they meet the eligibility requirements, any of our colleagues can apply for the opportunities we have available." (Soderholm Dep. at 31.) Soderholm was also asked whether the CCMII position given to Carlson was posted. She responded, "The recruiter would have posted that. Our practice is to post it internally and externally." (*Id.*) The record before the Court does not include a copy of any posting for the CCMII position given to Carlson.

Seifert was asked at his deposition whether he "ever explore[d] the possibility" of "a position available in either licensing or compliance that Ms. Weir could be transferred into

instead of being fired," and whether he "direct[ed] anyone to conduct a search as to whether there was any position in the entire company that Deb Weir might be able to transfer into instead of losing her job." (Seifert Dep. at 81.) He said no to both questions. (*Id.*)

## II. SUMMARY JUDGMENT STANDARD

"Summary judgment is proper only if the moving party shows that the record does not reveal a 'genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted) (citing *First Nat. Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. In determining whether Marsh is entitled to summary judgment, the Court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in her favor. *Id.* at 255.

## III. ANALYSIS

Weir alleges that Marsh violated the Age Discrimination in Employment Act ("ADEA") and Michigan's Elliott Larsen Civil Rights Act ("ELCRA"), and Michigan public policy. Marsh seeks summary judgment on all claims. For the reasons that follow, the Court finds that issues of

14

material fact preclude summary judgment on Weir's ADEA and ELCRA claims, but Marsh is entitled to summary judgment on her public policy claim.

## A. Age Discrimination in Employment Act

Under the ADEA it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To prevail on age discrimination "it is not sufficient for the plaintiff to show that age was a motivating factor in the adverse action; rather, the ADEA's 'because of' language requires that a plaintiff 'prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the "but-for" cause of the challenged employer decision.'" *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 529 (6th Cir. 2014) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009)).

Weir presents only circumstantial evidence of age discrimination. Therefore, the burden-shifting framework first announced by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 793 (1973), and subsequently modified in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 (1981), applies. *See Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009). Under this framework, the plaintiff must first establish a prima facie case of age discrimination by showing that she (1) was a member of the protected class of persons (i.e., persons 40 years of age or over), (2) was discharged, (3) was qualified for the position held, and (4) was replaced by a significantly younger person. *See Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 394 (6th Cir. 2008); *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003). The burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Allen*, 545 F.3d at 394. If this

15

burden is met, the burden shifts back to the plaintiff to show that the employer's explanation is a mere pretext for intentional age discrimination. *Id.* Although the burden of production shifts, the burden of persuasion remains on the plaintiff at all times to demonstrate that age was the "but-for" cause of the employer's adverse action. *Geiger*, 579 F.3d at 620 (quoting *Gross*, 557 U.S. at 177).

### 1. *Prima Facie Case*

It is not disputed that Weir was over 40 when she was terminated, that she was discharged, and that she was qualified for the position she held. But Marsh argues that Weir's termination was part of a work-force reduction and therefore Weir has a heightened burden to establish a prima facie case. In a reduction-in-force case, "the fourth prong of the prima facie age discrimination showing is supplanted by a requirement that the plaintiff proffer 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out [the plaintiff] for discharge for impermissible reasons.'" *Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1126 (6th Cir. 1998) (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)). But Weir maintains that this is not a reduction-in-force case because Weir was replaced by Carlson. The Sixth Circuit has explained that the heightened burden for reduction-in-force cases does not apply if the terminated employee is replaced:

> It is important to clarify what constitutes a true work force reduction case. A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.

*Barnes*, 896 F.2d at 1465. Another panel of the Sixth Circuit explained, "It is clear from this passage that we were attempting in *Barnes* to distinguish between the replacement of an employee and situations where there was a consolidation of jobs designed to eliminate excess worker capacity." *Spencer v. Hilti, Inc.*, 116 F.3d 1480 (table), 1997 WL 359094, at *5 (6th Cir. 1997).

Carlson was not an existing Marsh employee reassigned to perform Weir's duties in addition to his own. He was hired from the outside to become the new CCMII for all three call centers. Marsh relies on the fact that the position Carlson was given was a combination of Weir's and Gonzalez's jobs, and points to case law suggesting that the combination of two positions into one "clearly does not meet the definition of replacement." *Wilson v. Ohio*, 178 F. App'x 457, 465 (6th Cir. 2006). In *Wilson*, the court found that the plaintiff was not replaced by his counterpart in another department when his position was combined with hers. *Id.* Likewise in *Sahadi v. Reynolds Chem.*, 636 F.2d 1116, 1117 (6th Cir. 1980), the plaintiff's former duties were assumed by an existing employee, "who performed them in addition to his other functions." And in *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 726 (6th Cir. 2012), the court found an existing employee did not replace the plaintiff when he assumed the plaintiff's duties in addition to his own.

A key fact in the cases Marsh cites is that the plaintiff's duties were absorbed by an existing employee. *Grosjean v. First Energy Corp.* illustrates that this fact is significant. There, the Sixth Circuit found that the plaintiff was not replaced by his supervisor when the supervisor temporarily took over the plaintiff's duties in addition to his own. 349 F.3d at 335. But, the court continued, the plaintiff *was* replaced when a new employee was later hired from the outside to take on the same duties plaintiff had previously performed, and that his former supervisor had

17

been performing in the meantime. *Id.* at 336.[1] *Pelphrey v. Sears, Roebuck & Co.*, a case brought under Ohio's employment discrimination statute, lends further support to this distinction. 194 F.3d 1313 (table), No. 98-3420, 1999 WL 825096 (6th Cir. Oct. 8, 1999). There, a panel of the Sixth Circuit rejected the defendant's argument that the plaintiff was terminated in a RIF as defined by *Barnes*. *Id.* at *4. The plaintiff's hours had been reduced as a cost-saving measure. *Id.* at *1. When the amount of work temporarily increased, a new, younger employee (McClausland) was hired, also as a repair technician, instead of increasing Pelphrey's hours. *Id.* Shortly thereafter, Pelphrey was terminated, allegedly due to a reduction in force. *Id.* But when the temporary increase in work ended, McClausland was retained as a permanent employee. *Id.* The court said: "The evidence, when viewed in the light most favorable to Pelphrey, and when taken as a whole, raises a genuine issue of fact as to whether Sears instituted a legitimate RIF; or simply labeled Pelphrey's termination a 'RIF' in order to more easily discharge him, and replace him with McClausland, a younger (and lower paid) worker." *Id.* at *4.

Moreover, as Weir emphasizes, there was no financial motive for the reorganization: it provided only a $6,500 projected savings, which Seifert testified was not enough to justify a workforce reduction, and no net reduction in management positions. (Resp. at 13.) The Court finds there is sufficient evidence on which a reasonable jury could find that Weir was not terminated in a reduction in force, and therefore Weir is not required to meet the heightened fourth prong of a prima facie case. *See Block-Victor v. CITG Promotions, L.L.C.*, 665 F. Supp. 2d 797, 810 (E.D. Mich. 2009) (finding plaintiffs "proffered sufficient evidence to dispute that [their employer] was experiencing a *bona fide* RIF"). Since a reasonable jury could find that

---

[1] The court ultimately found that plaintiff was not replaced by a substantially younger worker because the age difference between plaintiff and the new hire was only five years. Here, the age difference between Weir and Carlson is more than 20 years.

Weir was replaced by 33-year-old Carlson, this is a disputed issue of fact and Weir has sufficiently established a prima facie case.

### 2. Pretext

Marsh offers a legitimate, non-discriminatory reason for Weir's termination: the elimination of her position in a reorganization of the call centers. (*See* Mot. at 18.) It is thus Weir's burden to show that a reasonable jury could find this was a mere pretext for unlawful discrimination, and Weir would not have been terminated but for her age.

"A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). "Regardless of which rebuttal method is employed, the plaintiff retains the ultimate burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him.'" *Imwalle v. Reliance Med. Products, Inc.*, 515 F.3d 531, 545 (6th Cir. 2008) (alteration in original) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003)). The evidence in this case is far from overwhelming, but there is enough that a jury could reasonably infer discrimination. In particular, the following fact issues are troubling: (1) Seifert decided to terminate Weir and Carlson was interviewed *before* Paine submitted the reorganization plan; (2) although Carlson had call center experience, he had no experience in the insurance field, while Weir's insurance call center experience was extensive; (3) the reorganization saved Marsh little or no money; (4) Weir's substantially younger counterpart Gonzalez may have been treated differently; and (5) it is not clear that the open CCMI and CCMII positions in the reorganized call center were posted so that Weir could have applied for them.

19

Viewed in the light most favorable to Weir, the evidence suggests that Marsh's explanation for Weir's termination was not the real motivation. Seifert said he decided in May 2012 to terminate Weir to save money (Seifert Dep. at 119–21); then in early July, Carlson submitted an application and was interviewed (Compl. ¶ 52; Ans. ¶ 52; Resp. Ex. Z at Pg ID 567–69); and only after those events, on July 19, did Paine submit her reorganization plan, which eliminates Weir's position without reducing call center management overall, and at a savings of only $6,500 per year (if Weir's $99,485 severance is not considered) (Resp. Ex. F at Pg ID 468, 471–74). Despite this sequence of events, Paine maintained that the decision to terminate Weir was ultimately hers, as part of her reorganization plan. (Weir Dep. at 92; *see also* Seifert Dep. at 119.) Meanwhile Marsh's additional explanation during the litigation, that "the call centers had been underperforming" (Mot. at 19), is undermined by evidence that the Dearborn call center exceeded goals for 2011 (Resp. Ex. C. at Pg ID 434, 435, 440) and Paine's admission that she did not believe that attrition/retention of agents, average call handling time, speed to answer, quality, and customer satisfaction played a role in the decision to terminate Weir. (Paine Dep. at 63–64.) There are enough contradictions and logical gaps in the evidence that a reasonable jury could conclude Marsh was hiding intentional discrimination. *See Peck v. Elyria Foundry Co.*, 347 F. App'x 139, 146 (6th Cir. 2009) (finding evidence of pretext where the employer's "reasons are inconsistent at best, if not outright contradictory").

It is also troubling that under Paine's reorganization plan, Gonzalez was reassigned to another position while Weir was terminated. (Resp. Ex. F at Pg ID 471.) At 43, Gonzalez was substantially younger than 56-year-old Weir, and thus any different treatment she received could be circumstantial evidence of age discrimination. *See Grosjean*, 349 F.3d at 336 ("Age differences of ten or more years have generally been held to be sufficiently substantial to meet

20

the requirement of the fourth part of age discrimination prima facie case."). Marsh argues that Gonzalez was not similarly situated and therefore should not be compared to Weir because she voluntarily applied for a job transfer before the reorganization occurred. The evidence partly supports Marsh's position: Gonzalez and Marsh Human Resources employee Soderholm both testified that Gonzalez made her own decision to apply for another position. (Gonzalez Dep. at 12; Soderholm Dep. at 28.) The only evidence Weir has offered to dispute this account is an affidavit from Weir's counsel stating that "[t]he only application in Gonzalez's entire personnel file was her original 2001 application for a customer service position with defendant." (Resp. Ex. M at ¶ 3.) But reasonable inferences can be drawn in Weir's favor. It is inherently suspicious that Gonzalez chose of her own volition to apply for a demotion. A reasonable jury could find that Gonzalez was in the same boat as Weir, and was thrown a lifeline while Weir was left to sink. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (distinguishing *Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992), and stating that a "plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated'").

Moreover, Marsh has not provided any evidence that the CCMI and CCMII positions in the reorganized call centers were posted as open such that Weir could have applied. On the contrary, Weir testified that she did not learn of the CCMII opening Carlson received until she was terminated. (Weir Dep. at 133.) Marsh emphasizes Weir's testimony that she looked at the weekly email of posted positions circulated by HR and never applied for any open position (Weir Dep. at 133), but those emails are not in the record and there is no evidence that they included the new CCMII position or other openings for which Weir was qualified. Nor is it apparent that

Weir had an opportunity to apply for open positions *after* she learned of the reorganization; before that, she had no reason to do so.

There are material issues of fact that preclude summary judgment on Weir's ADEA claim. Weir's case is not strong. But on the evidence presented, a reasonable jury could find that she would not have been terminated but for intentional discrimination on the basis of age. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) (holding that where "a prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability," "additional, independent evidence of discrimination" was not required to sustain a jury's finding of liability).

## B. ELCRA

Weir also claims that Marsh discriminated against her on the basis of age in violation of Michigan law. Michigan's ELCRA prohibits "discriminat[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . age[.]" Mich. Comp. Laws § 37.2202(1)(a). "In contrast to the ADEA's 'but-for' causation burden, under the ELCRA a plaintiff must ultimately prove that the defendant's discriminatory animus was a 'substantial' or 'motivating' factor in the decision." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 818 (6th Cir. 2011) (citing *Sniecinski v. Blue Cross & Blue Shield of Mich.*, 666 N.W.2d 186, 192–93 (Mich. 2003)). Michigan has adopted the burden-shifting *McDonnell Douglas* analysis to determine whether a plaintiff has met this burden based on circumstantial evidence. *Id.* (citing *Lytle v. Malady*, 579 N.W.2d 906, 914–15, 915 n. 19 (Mich. 1998)); *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 521 (Mich. 2001)). Because Weir's burden of persuasion for her ELCRA claim is lower than that required for the ADEA, this claim necessarily survives as well: a reasonable jury could infer that age discrimination was a substantial or motivating

factor in the decision to terminate Weir. The material issues of disputed fact discussed above also preclude summary judgment on Weir's ELCRA claim.

### C. Public Policy

Although employment is generally at will, Michigan recognizes an exception based on "the principle that some grounds for discharging an employee are so contrary to public policy as to be actionable." *Suchodolski v. Michigan Consol. Gas Co.*, 316 N.W.2d 710, 711 (Mich. 1982). The Michigan Supreme Court has described three examples of when this principle applies: "(1) the employee is discharged in violation of an explicit legislative statement prohibiting discharge of employees who act in accordance with a statutory right or duty; (2) the employee is discharged for the failure or refusal to violate the law in the course of employment; or (3) the employee is discharged for exercising a right conferred by a well-established legislative enactment." *McNeil v. Charlevoix Cnty.*, 772 N.W.2d 18, 24 (Mich. 2009) (citing *Suchodolski*, 316 N.W.2d 710).

Weir's claim would fall into the second category: she alleges that she was terminated for "her active opposition to and refusal to participate in defendant's unlawful credential sharing scheme." (*See* Resp. at 20–24.)[2] The Michigan Insurance Code provides that "[a] person shall not sell, solicit, or negotiate insurance in this state for any line of insurance unless the person is licensed for that qualification in accordance with this chapter." Mich. Comp. Laws § 500.1201a(1). It also provides that "a person required to be licensed under the laws of this state

---

[2] Weir states that her claim also falls into the third category, but she (by which the Court means her counsel) does not identify a right conferred by statute. The Michigan Insurance Code prohibits the activity Weir allegedly refused to participate in, but it does not affirmatively confer a right not to participate. Weir's argument that "her active opposition to and refusal to participate in the defendant's unlawful credential sharing scheme . . . *was* the protected activity" (Resp. at 23 (emphasis in original)) would collapse the distinction between the second and third categories.

to sell, solicit, or negotiate insurance" shall not act as an agent of an insurer unless the insurance producer becomes an appointed agent of that insurer." Mich. Comp. Laws §§ 500.1201(e); 500.1208a(1).

Marsh argues that Weir "has presented no evidence that she was requested or instructed to take any action that would violate the law." (Mot. at 24.) But the Sixth Circuit has said that this claim "does not depend upon a showing of a directive or request by the employer" because "[n]o Michigan court has defined this cause of action to require a plaintiff to show that the employer directed him or her to violate the law." *Morrison v. B. Braun Med. Inc.*, 663 F.3d 251, 257 (6th Cir. 2011). Of course, where evidence of such a directive is absent, it is more difficult to prove that there was "a causal connection . . . between the plaintiff's protected activity and the discharge," which the Michigan Supreme Court has held is an essential element of a claim for wrongful discharge in violation of public policy. *Clifford v. Cactus Drilling Corp.*, 353 N.W.2d 469, 474 (Mich. 1984). It is still the plaintiff's burden to establish that her failure or refusal to violate the law was "a determinative factor" in the decision to terminate. *See Morrison*, 663 F.3d at 257–58; *Silberstein v. Pro-Golf of Am., Inc.*, 750 N.W.2d 615, 622 (Mich. Act. App. 2008). And a "temporal relationship, standing alone, does not demonstrate a causal connection between [a] protected activity and any adverse employment action. Something more . . . is required to show causation." *Derderian v. Genesys Health Care Sys.*, 689 N.W.2d 145, 159 (Mich. Ct. App. 2004) (quoting *West v. Gen. Motors Corp.*, 665 N.W.2d 468, 473 (2003) (alterations in original)).

Weir has not provided "something more" to establish a causal connection between her termination and her refusal to participate in an unlawful credential sharing scheme—in fact, she has not even established a temporal relationship. The evidence, even viewed in the light most

favorable to Weir, shows that Marsh management repeatedly addressed Weir's concerns about credential sharing over the course of several years. Weir first expressed concern about licensing and appointment issues at the call centers to Seifert in 2006. New policies were developed in response. The only evidence that Weir received pushback on the issue during this period is her own testimony that at some unspecified point between 2006 and 2010, Seifert told her "management knows about it, it's not a big deal." (Weir Dep. at 139–40.) Yet Weir acknowledged that during the same period, the issue became a standing agenda item on weekly call center management calls until the policies were revamped. (*Id.* at 99, 105.) She also admitted that she received favorable reviews, salary increases, and a bonus after she began raising the compliance issues. (*Id.* at 117–20.) Indeed, Prom wrote in Weir's 2011 performance review: "She needs to continue bringing up issues of concern until they are addressed and fixed in an appropriate manner." (Resp. Ex. C at Pg ID 442.) Weir had raised the compliance issues again in 2010 or 2011, to Iregui, who elevated her concerns to Seifert. Weir makes much of the fact that Seifert told Marsh compliance investigator Harrison in 2011 that he was "unaware of any failure by Gonzalez to address compliance issues." (Resp. at 24.) But Harrison concluded that Seifert was right: her investigation "did not identify significant compliance issues nor was there evidence that the procedural deficiencies were not addressed once discovered." (Resp. Ex. D at 453; Harrison Dep. at 121–22.) *Cf. Cushman-Lagerstrom v. Citizens Ins. Co. of Am.*, 72 F. App'x 322, 328 (6th Cir. 2003) (affirming summary judgment for employer on public policy claim where plaintiff had not identified "any proposed actions that would have violated the law" and "[h]er concerns were passed on to upper management officials, who in turn determined that no violations had occurred or were occurring").

In response to this evidence, Weir argues that "[u]ntil 2011, Seifert was able to contain plaintiff's objections to this unlawful practice within his own reporting structure." (Resp. at 22.) It was "[i]n 2011 and continuing into 2012," when "plaintiff escalated the matter over Seifert's head," that "Seifert seized on his opportunity to silence Weir by orchestrating the scheme to fire her." (Resp. at 23.) But this argument is based on Weir's internal complaints about the alleged illegal scheme, not on Weir's refusal to participate. The Sixth Circuit has held based on Michigan case law that a public policy claim cannot be based on internally reporting alleged unlawful conduct to a supervisor. *See Scott v. Total Renal Care, Inc.*, 194 F. App'x 292, 298 (6th Cir. 2006) ("The district court properly dismissed Scott's claim for retaliatory discharge in violation of Michigan public policy because no law or policy tells Michigan employers that they must not retaliate against employees who report legal violations to their supervisors."); *Cushman-Lagerstrom*, 72 F. App'x at 328 ("[W]e are not persuaded that Michigan has provided a 'public policy' cause of action for an employee who is discharged for reporting violations of law to a superior."); *see also Robinson v. Radian, Inc.*, 624 F. Supp. 2d 617, 640 (E.D. Mich. 2008) ("The Court concludes that *Scott* and *Cushman-Lagerstrom* control on this issue and that under these authorities, a public policy claim cannot be based on internally reporting alleged unlawful conduct to a supervisor.").

No reasonable jury could conclude on the evidence presented that Weir was terminated for failing or refusing to violate the Michigan Insurance Code. Marsh is therefore entitled to summary judgment on Weir's public policy claim.

## IV. CONCLUSION

The Court finds that a reasonable jury could conclude on the evidence presented that Marsh violated the ADEA and Michigan's ELCRA by terminating the 56-year old Weir and

26

replacing her with the 33-year old Carlson, but could not conclude that Marsh terminated Weir in violation of Michigan's public policy. Marsh's Motion for Summary Judgment (Dkt. 19) is therefore GRANTED IN PART AND DENIED IN PART. The Court will schedule a status conference to set dates for trial on Weir's ADEA and ELCRA claims.

s/Laurie J. Michelson

LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated: June 16, 2015

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on June 16, 2015.

s/Lisa Bartlett for  Jane Johnson
Case Manager to
Honorable Laurie J. Michelson